**THE MONEY STORE INVESTMENT CORPORATION d/b/a First Union Small Business Capital, Appellant,**

v.

**Neal A. SUMMERS, et al, Appellee.**

No. 02A03–0404–CV–170.

Court of Appeals of Indiana.

Feb. 9, 2005.

Rehearing Denied April 18, 2005.

---

Mark R. Galliher, Craig D. Doyle, Joanne B. Friedmeyer, James L. Shoemaker, Doyle & Friedmeyer, P.C., Indianapolis, IN, Attorneys for Appellant.

G. Martin Cole, Jeremy J. Grogg, Burt, Blee, Dixon, Sutton & Bloom, LLP, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

The Money Store Investment Corporation, d/b/a/ First Union Small Business Capital, ("Money Store"), appeals the trial court's order that granted summary judgment in its foreclosure action to intervenor and third-party plaintiff Paula Phillips. The order also held that Phillips had an *in rem* judgment against the real estate of Neal A. Summers, ordered foreclosure of various mortgages, and found the mortgages on Summers' real estate that Phillips had obtained by assignment on

February 14, 2002 were superior to earlier mortgages held by Money Store.

We affirm.

### ISSUES

1. Whether the trial court erred in holding that mortgages assigned to Phillips secured payment of debts that Summers owed to Phillips before the date of the assignment.

2. Whether estoppel bars the grant of judgment to Phillips.

3. Whether the trial court committed reversible error when it failed to strike portions of affidavits submitted by Phillips.

4. Whether the trial court erred in finding Summers personally liable for the debts of Mangy Moose.

5. Whether the trial court erred in granting Phillips an award of attorney's fees.

### FACTS

During the years between 1992 and 1996, Neal Summers ("Summers") negotiated various loans with Fort Wayne National Bank, which is now known as National City Bank ("National City"). As security therefor, Summers executed a series of mortgages encumbering several parcels of his real estate. The mortgages were recorded. Three of the mortgages contained terms that are commonly referred to as "dragnet clauses."[1]

In 1998, Phillips brought a civil action against Summers and Mangy Moose Enterprises, Inc.[2] The matter was dismissed after Summers and Mangy Moose entered

---

1. Generally, a "dragnet clause" is defined as "a clause stating that a mortgage secures all the debts that the mortgagor may at any time owe to the mortgagee." BLACK'S LAW DICTIONARY 1031 (7th ed.1999).

2. Neither the complaint nor any of the pleadings in this matter was designated to the trial court in this matter. However, subsequent orders in the 1998 action were so designated and were also part of the trial court's order being appealed.

into a written settlement agreement with Phillips on September 15, 1999. However, Summers and Mangy Moose subsequently failed to comply with the agreement.

During at least the years 1999–2000, Summers issued various checks on an open business account at Fort Wayne National, the predecessor to National City, for "Paula's Seafood and Mangy Moose Saloon." (App.133–193). By August 31, 2000, there was a $4,770.16 overdraft in the "regular business checking" account of "Mangy Moose Enterprises Inc. DBA Mangy Moose Saloon DBA Paula's Seafood." (App.288).

In August–September of 2000, Summers sought loans from Money Store. On September 11, 2000, Jeffrey Harlan, an agent of the title company acting for Money Store, sent to National City a request for confirmation that a list of ten mortgages would be released and satisfied upon satisfaction of the three loan payoff statements attached to the letter. The pay-off statements reflected various amounts due to National City as of August 24, 2000, with daily interest amounts thereon subsequent to that date. National City responded on September 14, 2000, that the mortgages would be released "upon proper payoff of the three loans." (App.268). National City received three payments on September 15, 2000, but one payment was less than the amount indicated on the payoff statement. National City did not release its mortgages.

On September 15, 2000, Summers and Mangy Moose negotiated a loan from Money Store, also executing a promissory note and a mortgage on several parcels of Summers' real estate to secure the loan. On that same day, Mangy Moose—by Summers as president and secretary—executed an additional promissory note for another loan from Money Store, which note was also secured by a mortgage on Summers' real estate.

As noted above, Summers and Mangy Moose failed to comply with their written settlement agreement with Phillips in her legal action. Specifically, they failed to pay Phillips her sign-up bonus pay, accrued wages and vacation pay and to transfer 40% of the outstanding capital stock of Mangy Moose to her. Therefore, on August 10, 2001, Phillips filed a motion to enforce the settlement agreement that the parties had entered into on September 15, 1999.

Subsequently, on September 17, 2001, Money Store initiated a complaint for foreclosure on the real estate and appointment of receiver for Mangy Moose.

In an order dated October 5, 2001, the court found Summers and Mangy Moose had committed numerous material breaches of their written settlement agreement with Phillips and ordered specific performance of its terms. On February 5, 2002, the trial court found that Summers and Mangy Moose had "failed and refused" to comply with its order of October 5, 2001 and granted Phillips a monetary judgment in the amount of $205,700. (App.128).

On February 14, 2002, National City assigned to Phillips "all of its right and interest" in eleven mortgages it held on real estate owned by Summers. (App. 116). Thereafter, on March 13, 2002, Phillips filed a motion to intervene in Money Store's foreclosure action, along with her own complaint to foreclose. The trial court granted her motion to intervene.

Subsequently, both Phillips and Money Store amended their complaints for foreclosure. Although named as a party in both Phillips' and Money Stores' complaints, Summers neither appeared nor an-

swered their complaints.[3]

On June 6, 2003, Phillips filed a motion for summary judgment and designated certain evidentiary materials, including affidavits from her attorney and an officer of National City. Phillips also designated and cited the dragnet clauses in some of National City's mortgages; evidence that before September of 2000, Summers and Mangy Moose had incurred additional debt to National City in the form of overdrafts and charges which remained unpaid; her monetary judgment against Summers and Mangy Moose; her assignment by National City of its interests with respect to its mortgages on Summers' property; and evidence of her attorney's fees. Phillips argued that she was "the first position lien claimant," with her claims being "superior and prior to the claims, interests, and liens of" Money Store. (App.124).

On July 30, 2003, Money Store filed its motion for summary judgment. Money Store argued[4] that Summers' mortgages to National City "were paid in full with the proceeds" of the two notes given to Summers and Mangy Moose on September 15, 2000, and that "any interest that Phillips has in the mortgaged property is subsequent to that of the interest held by [ ] Money Store." (App.221, 222). The designated evidence in support of its "payment in full" argument was an affidavit by Jeffrey Harlan, an attorney who had represented the title company acting for Money Store, stating that "payoff funds were deposited" on September 15, 2000 with National City "as evidenced by the receipts," and that a September 14, 2000 transmission from National City had indicated that mortgages would be released

"upon proper payoff of the three (3) loans as quoted." (App.267).

On December 4, 2003, the trial court entered its judgment and decree foreclosing the mortgages of both Phillips (pursuant to the assignment by National City) and Money Store to Summers' real estate. Further, the order granted to Phillips not only an *in rem* judgment against Summers' real estate "from the overdrafts and [National City] Mortgage securing same," but also an *in rem* judgment against Summers' real estate "for her judgment lien" (arising from the written settlement agreement entered into by the parties on September 15, 1999), as well as "all reasonable and necessary collection and attorney fees associated with the foreclosure of her mortgages." (App.363, 364). The order further held that Money Store's mortgage was "subject, subordinate and inferior to the lien of [ ] Phillips' Mortgage and judgment lien." (App.367).

## DECISION

On appeal from summary judgment, we face the same issues that were before the trial court and analyze them the same way, although the trial court's decision is clothed with the presumption of validity. *Kennedy v. Guess, Inc.,* 806 N.E.2d 776, 779 (Ind.2004). "Summary judgment should be granted only if the evidence authorized by Indiana Trial Rule 56(C) shows that there is no genuine issue of material fact and the moving party deserves judgment as a matter of law." *Id.* (citing Ind. T.R. 56(C)). Here, Money Store presses no material issues of fact, but states that the appellate review "must simply consider whether the record reveals

---

3. According to the trial court's order, Summers "fled the country" after receiving the loans from Money Store. (App.355). Money Store asserts that there was no designated evidence to this effect.

4. Money Store provides its "memorandum in support of [its] motion for summary judgment," but not the motion. (App.220).

an incorrect application of the law to the facts." Money Store's Br. at 9.

### 1. *Phillips' Assigned Mortgage Interest*

Money Store presents a series of arguments to support its claim that the trial court "erred in ruling that mortgages assigned to Phillips by National City secured payment of debts Summers owed Phillips before the assignment." Money Store's Br. at 1. We address each.[5]

■ Money Store first contends that Phillips' rights as assignee are limited to those of National City, to wit: the overdraft claim.[6] Money Store argues that Phillips could not "acquire any greater rights than those enjoyed by her assignor" because "one who receives assignment of a mortgage may use that mortgage only to enforce payment of debts owed to the original mortgage holder and secured by such mortgage." Money Store's Br. at 10. Money Store cites no authority for the latter proposition. Rather, it erroneously offers this as the "clear implication" of the legal principle that "the assignee of a mortgage has no greater rights than the original mortgage holder," citing *Strafford v. Lane*, 124 Ind. 592, 24 N.E. 683 (1890). Money Store's Br. at 10. *Strafford* held that the assignees "d[id] not occupy any better position than their assignors." 24 N.E. at 685. Indeed, Indiana law in this regard provides that "[t]he assignee of a mortgage obtains all rights the mortgage had, but no other or greater rights than the mortgage." 20 I.L.E. *Mortgages* § 72 (2001). However, such law does not address the affect of a dragnet clause in an assigned mortgage. Nor does it address the fact that Phillips' rights as to a recovery against Summers did not rely upon the assignment alone but also a pre-existing, court-ordered monetary judgment to which the parties had agreed.

Next, Money Store argues that the trial court erred because its finding that the dragnet clause of one of those mortgages secured Summers' property for his obligation to Phillips violates the intent of the parties to those mortgages—National City and Summers. However, we note that each of the mortgages containing dragnet clauses also contain references to "the Mortgagee and/or its assigns." (App.115, 313, 315). Thus, it appears that an assignment was within the contemplation of the parties. Money Store concedes that Indiana law allows enforcement of dragnet clauses. *See Merchants Nat'l Bank v. H.L.C. Enters.*, 441 N.E.2d 509, 513 (Ind. Ct.App.1982) ("Indiana has long held that open-ended provisions in mortgages are valid."). But, Money Store then parses the language of the dragnet clause in each of the three assigned mortgages and urges that the language is not sufficiently broad to warrant including Summers' obligations to Phillips.

Money Store directs us to language of the August 2, 1995 mortgage that limits the reach of the dragnet clause to the principal amount of the mortgage—$42,000. However, we do not find the August 1995 mortgage language to be dispositive.

---

5. However, we find no such arguments made by Money Store to the trial court. In Money Store's response to Phillips' motion for summary judgment, it argued that Phillips had acquired by assignment only "a bare quitclaim of any interest" held by National City in the eleven mortgages referenced and "not an assignment of any debt underlying these security instruments." (App.222). Money Store's motion to correct error does not assert any of these arguments either.

6. Money Store labels this a "doubtful" overdraft claim, but directs us to no evidentiary dispute in this regard. Money Store's Br. at 10.

The mortgage earlier executed on October 2, 1992 states that the mortgage secures "payments of any and all other ... obligations of [Summers] to Mortgagee, direct or indirect, due·or to become due, now existing or hereinafter contracted...." (App.312). Similarly, the mortgage executed August 30, 1993, states that it "secure[s] the payment of any and all other ... obligations of [Summers] to the Mortgagee, direct or indirect, due or to become due, now existing or hereafter contracted...." (App.114). Money Store argues that because no further obligations were " 'contracted' by Summers," these dragnet clauses cannot serve to secure Summers' obligation to Phillips. Money Store's Br. at 12. We disagree. The language of the foregoing two mortgages of 1992 and 1993 is broad in referring to future obligations of Summers, and it is undisputed that Summers entered into a written settlement agreement with Phillips wherein he acknowledged certain financial obligations to her. Therefore, the designated evidence of the mortgage dragnet clauses supports the trial court's conclusion that the monetary judgment resulting from Summers' failure to comply with his written settlement agreement was, after Phillips acquired the mortgage through assignment by National City, "secured by" the dragnet mortgages. (App.357).

■ Money Store next argues that the trial court erred in tacking the assigned mortgages because such "subverted the settled role of Indiana law that a mortgage, to be effective, must 'describe and identify the indebtedness it is intended to secure.' " Money Store's Br. at 15, quoting *Bowen v. Ratcliff,* 140 Ind. 393, 39 N.E. 860, 861 (1895). This limitation, Money Store argues, precludes a dragnet clause being construed to encompass "all debts owed to any future assignee," *id.,* lest the mortgage be "a mere cover for the perpetration of fraud upon creditors." *See New v. Sailors,* 114 Ind. 407, 16 N.E. 609, 610 (1888).

This argument most expressly conveys the gravamen of Money Store's preceding assertions of trial court error in tacking Phillips' judgment to her assigned mortgage interest: that Money Store was somehow victimized by a practice that the law cannot condone. We acknowledge that, consistent with *New,* there may be limitations to the coverage of a dragnet clause as applied in various factual scenarios. But here, we are dealing with a sophisticated party. As indicated at the hearing on Money Store's motion to correct error, Money Store had been doing business as First Union, which had "been purchased by Wachovia Bank," constituting "the second largest bank merger in the history of the country." (Tr. 4). The litigation between Phillips and Summers was a matter of public record. The National City mortgages on Summers' property that contained dragnet clauses were all properly recorded. These recorded mortgages were notice to Money Store that inquiry should be made of National City concerning any additional obligations accrued by Summers subsequent to those mortgages. Yet, no designated evidence indicates that Money Store ever asked National City to indicate "all indebtedness" of Summers and Mangy Moose to the bank. Moreover, had such inquiry been made and funds given to National City to fully pay Summers' indebtedness, the difficulty of which Money Store now complains would have been avoided. Further, the indebtedness of which Money Store was informed was not fully repaid. Moreover, no designated evidence indicates that Money Store timely inquired as to why National City had failed to release its mortgages. Thus, it was Money Store's failure to take appropriate precautions to protect itself that led to its difficulty here. Because

Money Store failed to avail itself of the resources available for its own protection and directs us to no evidence of any scheme by Summers' creditors to perpetrate fraud, we do not find that the trial court's order applying the dragnet clauses to be error on this basis.

■ Finally, Money Store argues that tacking Phillips' judgment to the assigned mortgages was error because pursuant to statute, a priority claim could be made for no more than $42,000. Money Store cites Indiana Code § 32–29–1–10 as limiting "to the maximum amount stated in the mortgage" for "future advances" the first mortgage holder's priority in the face of intervening mortgage liens. According to Money Store, only one of the mortgages contained a dragnet clause—the one executed on August 2, 1995—which contained the mandatory statutory phrase "maximum amount of future advances." Money Store's Br. at 17. Thus, it asserts,

if National City had, on the date of its assignment to Phillips, made a new loan advance of $206,000—the "new" amount Phillips seeks to add to the mortgages— such advance would have been entitled to priority over the intervening Money Store mortgage only to the extent of the $42,000.

*Id.*

[4, 5] The statute provides as follows:

(a) In addition to any other obligation secured by a mortgage, a mortgage may also secure

(1) future obligations and advances up to the maximum amount stated in the mortgage. . . .

(b) The lien of a mortgage with respect to future advances, modifications, extensions, and renewals referred to in subsection (a) has a priority to which the mortgage otherwise would be entitled . . .

I.C. § 32–29–1–10. Courts are obliged to respect the plain language of a statute. *Sholes v. Sholes,* 760 N.E.2d 156, 159 (Ind. 2001). We find it would be a tortured construction to find that the statute gives lien priority only to the amount indicated in an express mortgage provision concerning future obligations, such as "future obligations and advances are limited to/cannot exceed _____." The plain meaning of the statute is that the mortgage *may* secure future obligations and advances up to the maximum amount stated in the mortgage, and that such future obligation would be secured at the same level of priority as the mortgage itself. The mortgages containing dragnet clauses specified a maximum mortgage amount of $42,000, $60,000, and $225,000 respectively. Thus, the statute does not bar tacking Phillips' judgment to the assigned mortgages.

2. *Estoppel*

■ Money Store claims that equitable estoppel bars Phillips' enforcement of the mortgages assigned to her by National City. Money Store begins from the premise that an assignee takes a mortgage subject to all the claims, equities and defenses available against the original mortgage holder, citing *Egbert v. Egbert,* 235 Ind. 405, 132 N.E.2d 910, 918 (1956). *See also* 20 I.L.E. *Mortgages* § 72 (2001). Money Store reminds us that National City's September 14, 2000 transmission to Harlan stated that its mortgages would be released upon payment of the amounts indicated. Money Store then asserts that it (1) "lacked knowledge or the means of knowing" that National City's mortgages might be claimed in the future to secure additional debt; (2) "relied on National City's promise to release its mortgages in exchange for the payoffs" indicated; and (3) "acted on its reliance by changing its position prejudicially" in that it advanced loans to Summers and Mangy Moose total-

ing more than $900,000. Money Store's Br. at 18.

■ A party asserting equitable estoppel must show its "(1) lack of knowledge and of the means of knowledge as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) action based thereon of such a character as to change its position prejudicially." *City of Crown Point v. Lake County*, 510 N.E.2d 684, 687 (Ind.1987).[7] As already noted, it is undisputed that the National City mortgages containing the dragnet clauses were properly recorded. Further, the public record contained some information about litigation between Phillips and Summers that pre-dated Money Store's loans to Summers. Finally, the designated evidence does not indicate that Money Store inquired as to "all" of Summers' indebtedness to the bank. Thus, Money Store has not shown a lack of "the means of knowledge as to the facts" of possible additional obligations by Summers that could have been secured pursuant to the terms of the mortgages. *Id.*

Phillips reminds us that Money Store failed to provide the "proper payoff" as indicated by National City. Money Store replies that the fact that its initial payments to National City were "in fact about $373 less than the payoffs quoted by National City" is of no moment because (1) the "later affidavit" by an officer of National City indicated that the "balance owed" was simply in the amount of the overdraft and related charges, and (2) $373 is "a minor discrepancy" that should be "disregard[ed]" by us. Money Store's Reply at 12, 13. As to the first assertion, *if*

the full payoff amounts were tendered to National City, there is no evidence indicating when that occurred. As to the second "minor discrepancy" assertion, Money Store's frequent references on appeal to the fact that it advanced a sum of more than $900,000 to Summers and Mangy Moose are stark reminders of how important it was for Money Store to confirm exactly what was owed National City *and to assure those debts were paid in full.* Further, Money Store cites to no evidence that it inquired of National City—subsequent to September 15, 2000—as to why National City had not given Money Store the releases. Money Store's general argument is unavailing because, as discussed above, the designated evidence does not show that Money Store proved its lack of "the means of knowledge as to the facts" now known. *Crown Point*, 510 N.E.2d at 687.

### 3. *Affidavits*

Money Store also argues that the trial court erred when it failed to grant its motion to strike portions of (1) the affidavit by an officer of National City, and (2) an affidavit by Phillips' attorney. Specifically, Money Store claims portions of the affidavits failed to comply with the requirement of Indiana Trial Rule 56(E) that statements be based upon personal knowledge and also contained inadmissible legal conclusions so as to contravene *Duncan v. Duncan*, 764 N.E.2d 763 (Ind.Ct.App. 2002), *trans. denied.*

The trial rule provides that

An affidavit submitted on a motion for summary judgment shall be made on

---

7. Money Store did not assert the affirmative defense of estoppel in its answer to Phillips' action or its memorandum of opposition to Phillips' motion for summary judgment. In its motion to correct error, Money Store baldly asserts that the trial court

erred when it failed to find that [Phillips], as successor in interest to National City is estopped from asserting that she holds a valid mortgage because all amounts secured by said mortgages were not satisfied. (App.386).

personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

Ind. Trial Rule 56(E). *Duncan* involved the appeal of a summary judgment order in a personal injury action that alleged the young vehicle driver's wanton and willful misconduct. The affidavit at issue stated that the driver's act of disobeying her mother by having her sister as a passenger in the vehicle was "willful misconduct," and we held that such a legal conclusion should not be considered. 764 N.E.2d at 766.

The affidavit of bank officer Kenneth Lust states that he was over the age of eighteen years of age, had "personal knowledge of the matters stated," was vice president of National City, and "was the officer responsible for the credit administration of the loan and other accounts of Mangy Moose Enterprises, Inc. and Neal Summers, its President." (App.207). Lust's affidavit further stated that on February 14, 2002, the date that mortgages were assigned from National City to Phillips, "Mangy Moose Enterprises, Inc. *and Neal Summers owed* to National City" $5,181.25 on various overdraft instruments and overdraft fees and that National City had "incurred a collection charge relating" to collection of the account in the amount of $2,000." *Id.* (emphasis added). Finally, Lust's affidavit stated the account number of "the Mangy Moose Enterprises, Inc. account." *Id.*

Directing the trial court's attention to the above highlighted language in Lust's affidavit ("and Neal Summers owed"), Money Store argued that it was "a legal conclusion rather than a fact inadmissible into evidence" because the affidavit also states that the account "was held by Mangy Moose and not Neal Summers." (App. 218). On that basis, Money Store asked the trial court to "strike as inadmissible" that portion of the affidavit. (App.218).

■ First, contrary to Money Store's argument to the trial court, Lust's affidavit did not aver that the Mangy Moose account "was held by Mangy Moose *and not Neal Summers.*" Second, based upon Lust's statement that he was responsible for "the credit administration of the loan and other accounts of" Mangy Moose and Summers, it appears that Lust had established a foundation for his having personal knowledge of the extent of Summers' personal liability for the overdraft indebtedness to National City.

Phillips' attorney, J. Philip Burt, also submitted an affidavit, wherein he submitted copies of what he averred were "true and accurate copies of the overdraft instruments of Neal Summers" on the account at National City for "Paula's Seafood and Mangy Moose Saloon, upon which the mortgage debt is secured." (App.132). Money Store moved to strike this averment as he lacked the requisite personal knowledge of the exhibits, and his statement of Summers' legal liability and the security effect thereof were inadmissible legal conclusions.

■ As Phillips correctly responds, in addition to the copies of checks submitted by Phillips' attorney, other designated evidence was also submitted by Money Store to confirm the overdraft liability as to the account. Further, as to the arguable inadmissibility of the attorney's statement about Summers' liability for the debts of Mangy Moose, what we said in *Duncan* was that the portion of an affidavit containing a conclusion of law "will not be considered in ruling on a motion for summary judgment." *Duncan*, 764 N.E.2d at 766. This comports with our supreme court's declaration that conclusory statements not admissible at trial "should be disregarded when determining whether to grant or deny a summary judgment mo-

tion." *Paramo v. Edwards,* 563 N.E.2d 595, 600 (Ind.1990). We presume that the trial court knows the law and complies with it. *El v. Beard,* 795 N.E.2d 462, 467 (Ind.Ct.App.2003). Accordingly, we presume that the trial court did not consider the portion of the attorney's affidavit stating that Summers was liable in reaching its decision on Phillips' motion for summary judgment, and we do not find its failure to grant Money Store's motion to strike to constitute reversible error.

### 4. *Summers' Liability*

Money Store next argues that "the contractual obligation to pay" the overdraft obligation "on the Mangy Moose checking account was owed by Mangy Moose, not Summers personally," and therefore, the trial court "erred in finding Summers personally liable for the debts of his corporation." Money Store's Br. at 20. Money Store asserts on appeal that the evidence before the trial court—and specifically the lack of "evidence ... that Summers fled the country" or "absconded with any corporate funds"—did not warrant "piercing the corporate veil" and "granting Phillips a first mortgage claim for the $5,181 in corporate overdrafts, plus interest." *Id.* at 21, 22.

However, in response to Phillips' motion for summary judgment, Money Store did not make this argument. Rather, Money Store argued to the trial court that Summers could not be held liable for the overdraft indebtedness based on a provision of the U.C.C. In its motion to correct error, Money Store asserted for the first time that the trial court's action of piercing the corporate veil to hold Summers liable as to the overdrafts was "not supported by sufficient evidence." (App.386). But the assertion in that regard did not cite any legal authority or develop an argument.

As discussed above, bank officer Lust of National City averred that he was "the officer responsible for the credit administration of the loan and other accounts of Mangy Moose Enterprises, Inc. and Neal Summers, its President," and that on the date National City assigned mortgages to Phillips, "Mangy Moose Enterprises, Inc. and Neal Summers owed to National City" $5,181.25 in overdrafts and fees and $2,000 in collection charges. (App.207). We earlier found that the officer's personal knowledge established a foundation for his admissible testimony that *Summers* was liable to National City for the overdraft indebtedness. This is admissible evidence that Summers was liable for the overdraft debt and could be considered by the trial court.

The grant of summary judgment may be affirmed "on any legal basis supported by the designated evidence." *Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258, 1264 (Ind.Ct.App.2002), *trans. denied.* In fact, we have stated that if the trial court's grant of summary judgment can be sustained on any theory or basis in the record, "we must affirm." *Ebersol v. Mishler,* 775 N.E.2d 373, 378 (Ind.Ct.App.2002). In essence, the affidavit of the bank officer sufficed to establish Summers' liability for the overdraft debt. Therefore, the trial court did not err in granting Phillips a first mortgage claim for that debt.

### 5. *Attorney's Fees*

Finally, Money Store argues that the trial court erred in awarding attorney's fees to Phillips, citing *Bank of New York v. Nally,* 809 N.E.2d 405 (Ind.Ct.App.2004), for the proposition that "a mortgage holder may not recover an award of its attorney's fees incurred in litigating with another mortgage holder over the priority of its mortgage." Money Store's Br. at 22. We first note that *Nally* has been vacated, as our supreme court granted transfer on

May 21, 2004. 812 N.E.2d 806. *See* Ind. Appellate Rule 58(A). Further, in *Nally,* we noted the absence of any language in the mortgage documents that expressly authorized entitlement to attorney's fees "for *all* litigation regarding their note and mortgage." 809 N.E.2d at 408 (emphasis in original).

Here, at least one of Phillips' assigned mortgages contains such express authorization. The mortgage executed by Summers on October 2, 1992, which contained a dragnet clause, states as follows:

> That in case the Mortgagee shall become a party to any suit or legal proceedings, relating to the above described property or any part thereof, all costs, expenses and attorney's fees necessarily incurred therein by the Mortgagee to protect the lien of this mortgage or any of the Mortgagee's rights hereunder, shall, with interest thereon at the rate of [default rate] per annum, become a part of the mortgage indebtedness hereby secured and shall, on demand, by paid by the Mortgagor.

(App.313). Because the mortgage authorized the recovery of "all costs, expenses and attorney's fees necessarily incurred" to protect the lien and rights of Phillips, as mortgagee, *Nally* does not render the trial court's award of attorney's fees contrary to law.

As the non-movant and appellant, Money Store bore the burden of demonstrating that the trial court's grant of summary judgment was erroneous. *Kennedy,* 806 N.E.2d at 779. Money Store has failed to do so.

Affirmed.

FRIEDLANDER, J., and MATHIAS, J., concur.